**STATE of Minnesota, Respondent,**

v.

**Bradley Allen LEONARD, Appellant.**

**No. C5–86–1688.**

Court of Appeals of Minnesota.

Feb. 3, 1987.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Robert F. Carolan, Dakota Co. Atty., Richard A. Enga, Asst. Co. Atty., Hastings, for respondent.

Gary L. Davis, Parranto & Davis, St. Paul, for appellant.

Considered and decided by CRIPPEN, P.J., and LANSING and NIERENGARTEN, JJ., with oral argument waived.

## OPINION

CRIPPEN, Judge.

Appellant Bradley Allen Leonard pleaded guilty to two counts of assault in the first degree, in violation of Minn.Stat. § 609.221 (1984), based on his physical abuse of an infant. On one count he was sentenced to 120 months, nearly a triple durational departure from the presumptive sentence of 43 months provided in the Minnesota sentencing guidelines. On the other count he was sentenced to a consecutive 42–month sentence; concurrent sentencing for the offense is presumptive under the guidelines. Appellant challenges the durational and consecutive service departures. We affirm.

## FACTS

On October 24, 1985, the Burnsville Police responded to a call from a hospital emergency room for possible child abuse. Dr. Thomas Stealey informed the police that a child, R.E., aged five months, twenty-three days, had sustained bruising to the head and legs and was the probable victim of child abuse. The police interviewed the infant's mother, Deborah Leonard, who indicated the child had been with appellant, her husband and R.E.'s stepfather, during the day of October 23. Leonard also told Dr. Stealey that appellant had admitted to her that he had beaten R.E.

Appellant was brought to the police department for questioning. He waived his *Miranda* rights and gave police a 44 page statement detailing numerous assaults and abuse of R.E.

Appellant indicated that he was angry at Capp Wabeke, R.E.'s natural father. Appellant asked his wife on several occasions whether they could "get rid of" R.E. by placing her for adoption. Appellant indicated he could never accept R.E.

Appellant stated he began assaulting R.E. when she was three to four weeks old and assaulted her on approximately 20 different occasions. Appellant would use his

208

fist or the back of his hand to strike blows to R.E.'s stomach, head, chest, or sometimes the legs. Appellant's abuse of R.E. occurred when the two were at home alone. Appellant indicated that he knew what he was doing was "definitely" wrong and could be harmful to R.E.

Appellant indicated that on one occasion in the summer of 1985 he wrapped blankets around R.E.'s head so he could not hear her crying. As a result of this incident, R.E. sustained seizures and was hospitalized in early August 1985 for approximately two weeks. Appellant made up a story that R.E. had sustained the injuries as a result of falling from a stool at a friend's house.

Late in August 1985, R.E. was rehospitalized because she was irritable, vomitting and dehydrated. While at the hospital, fluid was drained from her swollen head. Rather than getting a clear fluid, which is produced by the central nervous system, a bloody fluid was found that is consistent with acute trauma to the head. Because of the continual build-up of fluid, two shunts were placed in R.E.'s head to drain the fluid.

Approximately two weeks after her second release from the hospital, R.E. was again examined because of swelling of the head near a shunt. Dr. John O'Connell indicated that in looking back, this swelling would have been consistent with further traumatic injury. Appellant admitted that approximately two weeks after R.E.'s second release from the hospital, he continued to hit her on the head and stomach with his fist and the back of his hand. Appellant explained, "I would just literally beat on her."

On October 24, 1985, R.E. was subsequently examined by Dr. Stealey at the hospital emergency room because of her irritability. This contact led to the case being reported to the Burnsville Police because of suspected child abuse. Because of bruising to R.E.'s head and legs, a bone survey was taken, which revealed multiple fractures, both old and new. At the sentencing hearing, Dr. O'Connell summarized the findings as follows:

[M]ultiple trauma, bilateral fractures of the upper arm, bilaterial [sic] fractures of the lower arm, fracture of the shoulder, which is real unusual, multiple fractures of the ribs both in front and behind the rib, with fluid accumulation on one side, which is probably a result of the trauma to the ribs and the rib touching against what's called the pleura, the lining of the chest. Fractures of both legs, new fractures. And the left leg that needed traction and subsequent treatment. A fracture of the hand and a skull fracture on the right side.

Appellant admitted to the police that he had assaulted R.E. numerous times on October 23, 1985, the day before she was taken to the hospital emergency room. Appellant became frustrated with R.E.'s crying and her refusal to stop. Appellant then hit her "quite hard" with the back of his hand; a couple of times in the ribs, once in the leg and once in the head.

Appellant was charged with three counts of assault in the first degree in violation of Minn.Stat. § 609.221 (1984). Count I concerned the blanket-wrapping incident, Count II concerned assaults occurring from July 1, 1985 to October 23, 1985, and Count III concerned the assault on October 23, 1985. Count I was dismissed because it allegedly occurred in Hennepin County. Appellant pled guilty to the other two charges.

At the sentencing hearing, Dr. O'Connell testified concerning the extent and degree of R.E.'s injuries. R.E. presently has severe degeneration of the brain and severe psychomotor retardation. It is expected she will be severely retarded, will never be self-supporting, and may never walk.

Dr. O'Connell was unable to attribute or apportion the impact of the assaults and beatings versus the blanket-wrapping incident on R.E.'s present condition. However, he did indicate the blanket-wrapping incident likely caused the most harm.

On Count III appellant was sentenced to 120 months, nearly a triple durational departure from the presumptive 43–month

sentence, because of the particularly cruel manner in which he repeatedly assaulted R.E. On Count II appellant received a consecutive 42–month sentence because of the particular vulnerability of R.E. in light of her age and physical condition.

## ISSUE

Did the trial court err in imposing nearly a triple durational departure from the presumptive sentence and ordering consecutive service of appellant's sentences?

## ANALYSIS

Appellant had a criminal history score of 0 at the time of his convictions. The presumptive sentences for the first degree assault convictions (severity level VIII offenses) would be a 43 month executed prison term for the first offense and a concurrent 54 month sentence for the second offense. Minnesota Sentencing Guidelines IV. The trial court's sentences were both a durational and consecutive service departure from the presumptive sentences. *Id.* at II.F.; *State v. Wellman*, 341 N.W.2d 561, 565–66 (Minn.1983).

■ A departure from a presumptive sentence must be justified by "substantial and compelling circumstances." Minnesota Sentencing Guidelines II.D. Generally, when an upward durational departure is justified, the upper limit is double the presumptive sentence. *State v. Evans*, 311 N.W.2d 481, 483 (Minn.1981). To justify a greater than double departure, the trial court must find "severe aggravating circumstances." *State v. Norton*, 328 N.W.2d 142, 146 (Minn.1982). A greater than double departure will be upheld only in "rare cases" where the facts are "unusually compelling." *Evans*, 311 N.W.2d at 483.

■ The trial court is required to make specific written findings in support of sentencing departures as required by Minn. Stat. § 244.10, subd. 2 (1984). *See also* Minnesota Sentencing Guidelines II.D. and II.F; *State v. Hamer*, 341 N.W.2d 578, 580 (Minn.Ct.App.1983). Here the aggravating

factors for the durational departure and consecutive service departure are stated in the record. The record indicates that the trial court imposed the nearly triple durational departure because of the aggravating circumstances of particular cruelty to the victim as evidenced by the number of assaults, and the resulting great bodily harm to R.E. *See State v. Herberg*, 324 N.W.2d 346, 350 (Minn.1982); *State v. Mortland*, 399 N.W.2d 92, 95 (Minn.1987). The trial court ordered consecutive service of the sentences because of the aggravating circumstance of the particular vulnerability of the victim. *See State v. Stumm*, 312 N.W.2d 248, 249 (Minn.1981).

Under the *Evans* limitation, trial courts are normally limited to a double durational departure and cannot use the same general factors to justify an additional departure for consecutive service of sentences. *See State v. Gissendanner*, 343 N.W.2d 668, 669 (Minn.1984). However, the supreme court has upheld the use of a greater durational departure and a consecutive service departure when there are severe aggravating circumstances. *See Wellman*, 341 N.W.2d at 566.

■ We see this as a rare case where the facts are so unusually compelling that both the nearly triple durational departure and consecutive service departure are justified and do not unfairly distort the criminality of appellant's conduct.

Appellant claims the trial court erred in imposing the aggravated sentence because it erroneously focused upon R.E.'s poor present physical condition and mental retardation, which was primarily caused as a result of the blanket-wrapping incident. That charge was dismissed because it allegedly occurred in Hennepin County. However, the trial court did not depart, and the State did not urge the court to depart, because of the blanket-wrapping incident. The trial court imposed the durational departure because of the particular cruelty of appellant's numerous assaults on R.E. and the resulting great bodily harm. Appellant admitted assaulting R.E. in the head, ribs

and leg the day before she was taken to the emergency room. He also assaulted her on approximately 20 different occasions. The various assaults caused multiple fractures, including bilateral fractures of the upper and lower arm, fracture of the shoulder, multiple fractures in front and behind the ribs, with fluid accumulation on one side, fractures of both legs, a fracture of a hand, and a skull fracture on the right side. One leg fracture required the leg to be put in traction. The extent to which these assaults contributed or caused R.E.'s brain retardation is unclear. Dr. O'Connell testified that the bloody fluid on the brain is highly unusual and consistent with acute trauma to the head, although he was unable to apportion the impact of the assaults or the head fracture on R.E.'s present condition.

The trial court imposed consecutive service of sentences because of the particular vulnerability of R.E. in light of her age and poor physical and mental condition. Appellant assaulted R.E. from the time she was three to four weeks old until she was nearly six months. Appellant continued to assault R.E. even after her hospitalization and while she was in fragile physical and mental condition. Appellant admitted that he continued to assault R.E. approximately one or two weeks after she was released from the hospital, apparently while she still had a shunt in her head to drain the fluids from around the brain.

Appellant's continual assaults of a helpless, injured infant and the resulting multiple fractures presents the uncommon case with "severe aggravating circumstances" justifying the nearly triple durational departure and consecutive service departure. *See Wellman*, 341 N.W.2d at 566. The particular vulnerability of R.E. at her young age and poor physical and mental condition, and the cruelty of the numerous assaults is clear and reprehensible.

Appellant also asserts the trial court erred in failing to: (1) depart dispositionally from the presumptive sentences; (2) order a new presentence investigation report; (3) recuse itself; and (4) consider appel-

lant's mental condition at the time of the commission of the offenses when it determined to aggravate his sentence. We have examined each of these claims and find they are without merit.

## DECISION

This is the rare case where the nearly triple durational departure and consecutive service of sentences is justified.

Affirmed.